# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: DECEMBER 18, 2025
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2024-SC-0304-MR

GREGORY M. HEIGHTCHEW            APPELLANT

V.
ON APPEAL FROM HENRY CIRCUIT COURT
HONORABLE JERRY CROSBY, II, JUDGE
NO. 18-CR-00158

COMMONWEALTH OF KENTUCKY            APPELLEE

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING

A jury of the Henry Circuit Court found Appellant Gregory Mason Heightchew guilty of murder (principal or accomplice), first-degree arson (principal or accomplice), attempted murder, and tampering with physical evidence. The jury recommended a total sentence of life imprisonment without the possibility of parole for twenty-five years, which the trial court imposed. Heightchew now appeals to this Court as a matter of right. Ky. Const. § 110(2)(b). After careful review, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

This matter relates to the killing and burning of Elijah Creekmore by Appellant Gregory Heightchew and his accomplice Joshua Jackson. On October 1, 2018, Demarcus Pinion learned from Roberto Polo Jiminez that Heightchew suspected Pinion and a friend, Creekmore, of breaking into his

home and stealing money and marijuana. Pinion called Heightchew, who indeed accused Pinion and Creekmore of stealing from him. Pinion denied any involvement and informed Heightchew that he and Creekmore were going to Heightchew's house to talk and sort out the misunderstanding. Pinion and Creekmore then headed to Heightchew's home.

Before Pinion and Creekmore's arrival, Heightchew or one of his associates placed a handgun in Heightchew's mailbox. Heightchew also told his girlfriend, Brooklynn Clark, to leave the property because he had to "handle his business." She then drove Heightchew's BMW to the house of a friend, Haley Kemper.

Later, Pinion and Creekmore arrived at Heightchew's house in Creekmore's gray sedan. Heightchew and his associates Jiminez, Joshua Jackson, and Antonio Garcia were outside of Heightchew's house at the time. Heightchew, Creekmore, and Pinion began arguing, Heightchew accusing the pair of the burglary and Pinion and Creekmore denying their involvement. According to witness testimony, Heightchew then reached into the mailbox, pulled out the handgun, placed it within inches of Pinion's face, and pulled the trigger. The gun did not fire because the safety was engaged. Pinion and Creekmore then began running up the street in opposite directions. Witnesses testified that Heightchew shot at both as they ran.

Pinion safely reached the house of a neighbor, who called 911. However, Creekmore fell, and drops of his blood were later discovered on the property. Jiminez got in his vehicle and fled with Garcia. Heightchew and Jackson seized

Creekmore, placed him in his gray sedan, and drove him to a swimming hole twenty-five miles away in Lockport. Medical evidence demonstrated that Creekmore's skull was broken, causing severe head trauma. Creekmore was also shot in the stomach at least once, perforating his small intestine. While Creekmore was still alive, he was also set on fire. He was still in the car at the time, which was set aflame as well.

After Creekmore and his car were set ablaze, Heightchew and Jackson fled on foot. Heightchew called Clark, asking her to pick them up, but not in Heightchew's BMW. Clark and Kemper, using Kemper's vehicle, picked the pair up approximately 1.5 miles away from where they had left Creekmore. After returning to Heightchew's home to pack, Heightchew and Clark fled to his grandmother's house in Lexington.

That evening, Pinion spoke with police and told them that Creekmore was missing after Heightchew shot at him. Officers went to Heightchew's home twice that evening to look for Creekmore. During both visits, the officers knocked on the front door and the basement door—also located on the front of the home—but no one answered. During their second visit later that same night, the officers also walked the perimeter of the home, including through the back yard where they used a thermal imaging device in an unsuccessful attempt to locate Creekmore. The officers then returned to the front yard and were about to leave when they found four spent shell casings on the edge of the driveway. The officers collected the casings, marked their locations, and left.

The following morning, a construction worker arrived at the swimming hole in Lockport and found Creekmore's remains in the burned-out gray sedan. The remains were burnt beyond recognition, requiring the coroner and medical examiner to use a forensic dentist to identify Creekmore's body with dental records. His causes of death were a gunshot wound to the abdomen, head trauma, thermal injuries from the fire, and smoke inhalation.

Next to Creekmore's body, police found one .45-caliber shell casing located in front of a pool of blood. The shell casing matched the gun markings on the four casings found at Heightchew's home, suggesting that all five casings were fired from the same weapon, a semi-automatic .45-caliber handgun. Police also found Heightchew's .45-caliber Remington model 1911 handgun in the nearby swimming hole.[1] Law enforcement discovered two sets of footprints next to the burned-out car containing Creekmore's body. One set was consistent with Jackson's shoes, which were later found in a burn pit on his property. Cell phone tower data also showed that Heightchew and Jackson were in the area at the time of the murder. The pool of blood next to Creekmore's body and the blood drops found on Heightchew's property also matched Creekmore's DNA.

The day after the crime, Heightchew went to state police and voluntarily spoke with them about the incident. He was ultimately indicted on charges of

---

[1] A witness testified at trial that he sold Heightchew the .45-caliber Remington model 1911 handgun recovered from the swimming hole.

murder, arson, attempted murder, and tampering with physical evidence. The indictment was subsequently amended to conform to a complicity theory.

Prior to trial, Heightchew moved to suppress the four shell casings found by his driveway. The trial court denied the motion, finding that Heightchew had failed to establish that the home was his residence and thus also failed to establish that he had a reasonable expectation of privacy in the area where the shell casings were found.

Jackson was charged as an accomplice in connection with the incident and ultimately pled guilty, agreeing as part of his plea deal to testify at Heightchew's trial. However, contrary to his agreement, Jackson instead wrote a purported affidavit asserting that he alone was responsible for the crimes, which he submitted to the trial court mere days before Heightchew's trial. Notably, however, Jackson implied in calls from jail that his motivation in making the statement was to hinder Heightchew's trial. Additionally, as discussed in further detail below, the content of these calls cast doubt on the reliability of his statement.

The Commonwealth moved to exclude Jackson's affidavit as hearsay. However, Heightchew contended that the statement was one against penal interest and thus admissible under a valid hearsay exception.

At trial, the trial court brought Jackson in outside of the presence of the jury to determine if he would testify. Jackson refused. The trial court then found him in contempt and ruled that he was unavailable. The trial court further granted the Commonwealth's motion to exclude Jackson's statement

5

because it "lacked the necessary indicia of reliability" for admission. Heightchew nonetheless moved forward at trial with his alleged alternative perpetrator ("aaltperp") defense that Jackson was responsible for the crimes, though without the use of Jackson's affidavit. Jackson's plea was later set aside given his failure to testify.

During trial, Heightchew submitted proposed jury instructions. These included instructions for facilitation of murder and arson and a tampering-with-evidence instruction that referred only to tampering with the gun. However, the trial court's proposed final instructions to the jury did not include a facilitation instruction. Those instructions also combined four separate items into the single tampering instruction. Heightchew objected to the lack of a facilitation instruction, but articulated no further objections before the jury was instructed. The trial court overruled Heightchew's objection as to facilitation and submitted the finalized instructions to the jury.

Heightchew was convicted of murder, first-degree arson, attempted murder, and tampering with physical evidence. The trial court accepted the jury's recommendation of life imprisonment without the possibility of parole for 25 years. Heightchew now appeals to this Court as a matter of right.

### ANALYSIS

Heightchew raises five issues for our review: (1) whether the trial court erred in excluding Jackson's affidavit asserting that he committed the crimes; (2) whether the trial court erred in refusing to the instruct the jury on facilitation to murder and arson; (3) whether the trial court should have

6

suppressed law enforcement's discovery of the shell casings found in Heightchew's front yard; (4) whether the jury's verdict regarding tampering with evidence violated the unanimity requirement; and (5) whether reversal is warranted on grounds of cumulative error. We review each issue in turn, providing additional facts as necessary.

## I.      The Trial Court Properly Excluded Jackson's Affidavit.

Heightchew first asserts that the trial court erred by excluding Jackson's affidavit from being admitted as evidence, arguing that the statement falls within the valid hearsay exception under Kentucky Rule of Evidence ("KRE") 804(b)(3) for statements against penal interest. We disagree.

In his original statement to law enforcement during the course of its initial investigation, Jackson asserted that he aided Heightchew in the killing of Creekmore. Jackson was thus charged as an accomplice to Heightchew in the murder. After being charged, Jackson entered a plea agreement with the Commonwealth which included a reduced sentence of 30 years in exchange for Jackson's willingness to testify as a witness against Heightchew for the Commonwealth at trial. However, a few days prior to the start of trial, Jackson attempted to recant his original statement by writing an affidavit stating that he was the sole participant in the shooting and burning of Creekmore, with no involvement by Heightchew.

Jackson proceeded to sign, notarize, and ultimately submit his affidavit to the trial court with a request that it be placed in Heightchew's file for presentation to the jury. Thereafter, Jackson appeared at trial pursuant to a

7

subpoena and was called by the court outside the presence of the jury to determine whether he would testify. He indicated that he would not, which led the trial court to hold him in contempt and find him unavailable as a witness. Once Jackson was ruled unavailable, the Commonwealth immediately filed a motion to exclude his statement, arguing that even if he were to be considered unavailable, his statement lacked the necessary indicia of reliability to be admitted. Heightchew then countered by asserting that Jackson's statement was a statement against penal interest admissible under KRE 804(b)(3).

The trial court granted the Commonwealth's motion to exclude Jackson's statement because it found: (1) the statement lacked trustworthiness; (2) it would be inherently unfair to admit the statement because the Commonwealth had no opportunity to cross-examine Jackson[2]; and (3) excluding the statement would not otherwise prevent Heightchew from presenting an aaltperp defense. Heightchew now argues on appeal that Jackson's affidavit was a valid statement against penal interest under KRE 804(b)(3) and that the trial court erred by excluding the statement.

This issue is preserved given Heightchew's argument to the trial court that the affidavit was admissible under KRE 804(b)(3). Rule of Criminal Procedure ("RCr") 9.22. The standard of review of an evidentiary ruling under

---

[2] The Commonwealth of course does not have a right of confrontation under the Sixth Amendment, which applies only to criminal defendants. See *Crawford v. Washington*, 541 U.S. 36 (2004). While the trial court noted the prosecution's inability to cross-examine, it did not do so to afford the Commonwealth a Sixth Amendment right. Rather, the court treated the lack of cross-examination as part of its broader trustworthiness analysis.

KRE 804(b)(3) is abuse of discretion. *Fugett v. Commonwealth*, 250 S.W.3d 604, 619 (Ky. 2008). This Court will not disturb the trial court's decision to admit evidence absent an abuse of discretion. *Anderson v. Commonwealth*, 231 S.W.3d 117, 119 (Ky. 2007). The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles. *Cox v. Commonwealth*, 553 S.W.3d 808, 814 (Ky. 2018).

### A) Hearsay Exception For Statements Against Penal Interest

We first consider Heightchew's contention that Jackson's affidavit, though hearsay, was admissible as a statement against penal interest. Jackson's statement asserting that he was the sole participant responsible for Creekmore's death was hearsay under KRE 801 because it was an out-of-court statement "offered in evidence to prove the truth of the matter asserted." However, Rule 804(b)(3) creates an exception to the hearsay rule for statements against interest, highlighting the necessary indicia of trustworthiness for statements against penal interest in particular to fall within the exemption. More particularly, the Rule exempts from hearsay

> [a] statement which was at the time of its making . . . so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Unlike statements that implicate proprietary and pecuniary interests, the final sentence of Rule 804(b)(3) requires statements against *penal* interest to have corroborating circumstances that "clearly indicate the trustworthiness of

9

the statement." To determine the trustworthiness of a statement, the trial court is required to consider the totality of the circumstances, including not only the circumstances surrounding the making of the statement, but also other evidence at trial that corroborates the truth of the statement. *Fugett*, 250 S.W.3d at 620. This heightened burden of showing trustworthiness for statements against penal interest is intended to simultaneously remedy both the lack of opportunity to cross-examine the declarant and the persistent issue that ulterior motives often influence statements tending to expose declarants to criminal liability. *Crawley v. Commonwealth*, 568 S.W.2d 928, 931 (Ky. 1978); *Chambers v. Mississippi*, 410 U.S. 284, 300 (1973).

Before proceeding to the merits of Heightchew's assertion that Jackson's affidavit falls within KRE 804(b)(3), we must first address his contention that the trial court improperly invaded the province of the jury by considering the credibility of the affidavit. More particularly, Heightchew cites *Martin v. Commonwealth*, 686 S.W.3d 77 (Ky. 2023), and *Williamson v. United States*, 512 U.S 594 (1994), to argue that the self-inculpatory statement made by Jackson is in itself sufficient to show particularized guarantees of trustworthiness, and that the trial court erred in considering Jackson's credibility in reaching its decision to exclude his statement. We disagree. While it is true that it is the jury's job to assess the credibility of witnesses, not the court's, *see Martin*, 686 S.W.3d at 98, it is the court's responsibility—not the jury's—in its role as evidentiary gatekeeper to determine whether there is a sufficient level of corroboration to render the statement "trustworthy." *See*

10

*Commonwealth v. Melton,* 670 S.W.3d 861, 870 (Ky. 2023) ("The trial court has a general obligation as evidentiary gatekeeper to screen evidence to ensure that the jury does not hear irrelevant or inadmissible evidence.") (VanMeter, C.J., dissenting).

Further, this Court has reiterated that the burden of establishing the requirements under KRE 804(b)(3) rests with the proponent of the statement. *Fugett,* 250 S.W.3d at 620. Thus, in order to prevent juries from receiving perjured testimony, a trial court's job is not limited to merely determining if the proponent made the statement. Rather, it is not only well within the discretion of the trial court, but in fact absolutely necessary to assess the totality of the circumstances behind the making of the statement and ultimately come to a reasonable conclusion as to whether the proponent has met the necessary indicia of trustworthiness for admission of the statement. Thus, the trial court here, consistent with its role as evidentiary gatekeeper, properly considered the trustworthiness of the affidavit.

We now turn to consider whether the trial court erred in finding that Jackson's affidavit was inadmissible as a statement against penal interest. This Court in *Crawley,* 568 S.W.2d at 931, set out four considerations relevant to the trustworthiness of statements sought to be admitted under KRE 804(b)(3): (1) the time of declaration and the party to whom made; (2) the existence of corroborating evidence in the case; (3) the extent to which the declaration is really against the declarant's penal interest; and (4) the

11

availability of the declarant as a witness.[3] Here, there is no dispute Jackson was unavailable, and we therefore proceed to consider the remaining three factors.

The first trustworthiness consideration set forth in *Crawley* is an assessment of the time of declaration and the party to whom made. In this case, Jackson drafted and submitted a notarized statement to the trial court more than six years after the crime occurred and conveniently only a few days before trial. On the one hand, the passage of a large amount of time—indeed, more than six years—between the time of the crime and Jackson's making of his statement significantly undercuts the reliability of that statement. *See Crawley*, 568 S.W.2d at 931 (holding that the passage of several months undermined the reliability of a purported statement against penal interest). On the other hand, it is also notable that Jackson submitted his affidavit to the trial court, which one could reasonably interpret as imbuing the statement with greater reliability. Thus, because the timing of the statement undermines its reliability while the recipient could conceivably support its reliability, we conclude this factor neither weighs in favor of nor against finding the statement trustworthy and thus admissible.

The second—and most significant—*Crawley* consideration is the existence of corroborating evidence in the case. When assessing this consideration, the issue is not whether there is corroborating evidence that

---

[3] These factors are not intended to be exhaustive or absolute. *Fugett*, 250 S.W.3d at 620.

Jackson was a mere facilitator or accomplice to Heightchew. Rather, the issue is whether Jackson's assertion in the affidavit that he *alone* was responsible for the shooting and burning of Creekmore is trustworthy. Further, when assessing the existence of corroborating evidence, the trial court must consider the totality of the circumstances, including not only circumstances surrounding the making of the statement, but also other evidence at trial that corroborates the truth of the statement. *Fugett*, 250 S.W.3d at 620. We also take this opportunity to clarify that this consideration is not confined to only evidence that supports the statement, but rather it must also take into account evidence that contradicts the truth of the statement as well.

Admittedly, here there is at least some evidence that might be seen as supporting Jackson's assertion that he was responsible for Creekmore's death. First, there is proof of (1) Jackson's matching footprints near the burned car at the swimming hole where the murder occurred, (2) Jackson's cell phone pinging at cell towers near that same location, and (3) Jackson being picked up by Heightchew's girlfriend near that location. This evidence certainly is sufficient to establish that Jackson was at least present at the scene of the crime. Second, Creekmore was also still alive at the time the car was set on fire, meaning that it is at least possible that Jackson undertook the arson and murder himself without Heightchew's involvement. Third, Jackson had already pled guilty to complicity to the arson and murder of Creekmore, which further supports his statement. Thus, there is at least some evidence to support Jackson's assertion in the affidavit that he was responsible for the crimes.

13

However, while the record thus reveals at least some evidence supporting Jackson's assertion, it also reveals an overwhelming amount of evidence strongly undermining the trustworthiness of that assertion. First, in recorded jail calls with his girlfriend, Jackson made statements regarding "writ[ing] them a little bullshit story," and that doing so "should be enough for the trial to get pushed back because it's new evidence." Even more significantly, Jackson also acknowledged in the recorded jail calls that his assertion he alone was responsible for the crimes is a lie. Indeed, when the other person on the line confronted Jackson with the fact that the affidavit would be a lie, Jackson responded: "Ah who gives a fuck about a lie, I lie all the time. I lie every day, who cares. G-d near 30 years old, I don't give a fuck about lying." Further, Jackson's statement submitted to the trial court claiming he is the sole participant in the arson and murder with no involvement from Heightchew was the first and only time that Jackson mentioned anything of the sort, which this Court has seen as a cause of concern when assessing the trustworthiness of statements against penal interest. *See Crawley*, 568 S.W.2d at 931 (holding that trustworthiness becomes an issue when there is nothing in the record to indicate that the statement was made to another at any time). Under such circumstances as these, where the declarant is recorded admitting that the statement against penal interest is untruthful, we can find no abuse of discretion in the trial court's exclusion of that statement.

While we believe our analysis of this consideration could end here, there is still other substantive evidence from the crime scene itself that points toward

14

Jackson not acting on his own. For example, it is undisputed that Heightchew, similar to Jackson, (1) was at the swimming hole at the time the crimes were committed; (2) had his phone pinging near the location of the swimming hole; and (3) was picked up by his girlfriend near the scene of the crime. Perhaps more significantly, an important differentiation between Jackson and Heightchew arises in that, unlike Jackson, (1) Heightchew had been observed earlier the same day firing his .45-caliber gun at Creekmore and (2) that same gun was recovered from the swimming hole near the scene of the crime. This substantive evidence of Heightchew's specific animus towards Creekmore strongly undercuts Jackson's contention that Heightchew was simply an innocent bystander to the crime. Thus, the evidence undercutting Jackson's statement strongly outweighs the meager evidence that might be seen as supporting it.

In sum, given that little-to-no evidence aside from Jackson's affidavit has been offered by Heightchew to support the specific assertion that Jackson was the sole perpetrator in causing Creekmore's death, we find this consideration to weigh heavily against the admissibility of the statement. For this consideration to weigh in favor of Heightchew, it was necessary to provide some corroborating evidence for the specific assertion that Jackson was the sole perpetrator and cause of Creekmore's death—which is absent here. Further, the circumstances surrounding the making of the affidavit, such as Jackson's original statement to law enforcement, the jail recordings, and the evidence found at the crime

15

scene, appear if anything to contradict his affidavit rather than corroborate it. As such, we conclude this factor weighs against admission of that affidavit.

Finally, we also conclude the last *Crawley* consideration as to whether the statement was truly against penal interest neither weighs in favor of nor against admission of the affidavit. As with the corroboration consideration, when assessing the extent to which the declaration is really against the declarant's penal interest, we must look to the totality of the circumstances. Here, the facts are somewhat unusual in that Jackson affirmatively stated in the affidavit that he knew it could result in the withdrawal of his plea agreement, yet also stated in recorded jail calls that he had received legal advice that the affidavit could not lead to further criminal liability. Courts have recognized that even a statement that is objectively against penal interest may nonetheless lack sufficient trustworthiness if it was not subjectively understood by the declarant as being against his penal interest. *United States v. Alvarez*, 266 F.3d 587, 593 (6th Cir. 2001); Lawson, *The Kentucky Evidence Law Handbook*, § 8.45[5][b] (2023 ed.). Indeed, the rationale underlying this exception—that one does not generally falsely make statements contrary to his penal interests—is inapplicable if the declarant does not in fact believe the statement to be against his interest. Thus, the word "really" in this consideration alludes to both an objective and subjective test, considering in its totality whether a reasonable person could conclude that Jackson really understood and believed what he was subjecting himself to. *See Alvarez*, 266 F.3d at 593 (explaining that under analogous Fed. R. Evid. 804(b)(3), when the

16

circumstances indicate that a witness's statements did not leave the witness with the understanding that he was subjecting himself to "real criminal liability," it brings the "trustworthiness" of such statements into question).

Here, on its face, the statement was against Jackson's penal interest. The statement did in fact tend to subject Jackson to additional criminal liability—arising from a withdrawal of his plea agreement—for being the sole perpetrator of these crimes. However, despite Jackson stating in the affidavit that he understood it could result in a withdrawal of his plea, jail call recordings reveal that he believed from purported legal advice that lying would not make him any worse off, and that his lawyer suggested there was a chance his plea would not be withdrawn by the Commonwealth. Further, jail calls also reveal that Jackson felt not having the plea would "result in the same consequences," and that he would be "screwed regardless" of whether his plea was withdrawn or not. Therefore, it follows that even if Jackson's alleged "legal advice" was wrong and his plea deal did in fact get withdrawn, he seemingly did not care or understand it to have an effect on his penal outcome.

Additionally, there is evidence showing that Jackson may have cared more about his well-being in prison than he did about receiving a reduced sentence, and thus was willing to lie and take the risk of more jail time (against his penal interest) in exchange for better treatment in his current environment. In the same recorded jail calls, Jackson stated his reputation and name are "all he has", and that he would "rather lie than not be comfortable." Jackson's actions and words in fact suggest that he believed not testifying and instead

17

writing the affidavit would make him better off by allowing him to be treated better in prison while still potentially being shielded from further penalty. In other words, Jackson's subjective motivation of making the statement to preserve his reputation and maintain his comfort further undermines any finding he subjectively believed the affidavit would be against his penal interest.

When considering the totality of the circumstances surrounding Jackson's statement, we acknowledge that it was actually against his penal interest. Jackson did in fact lose his plea deal, and if he were to be found guilty as a principal in the murder of Creekmore, it could result in more jail time. Nonetheless, as discussed above the record also reveals Jackson's underlying incentives in making the statement, including his belief that the affidavit would not jeopardize his plea deal and indeed could make his time in prison more comfortable. Due to these unique circumstances, we see this consideration having no effect in our final determination and believe it to neither weigh for nor against Heightchew.

After weighing these *Crawley* considerations in their totality, we find there to be insufficient corroborating circumstances in support of the trustworthiness of Jackson's statement. As noted above, the statement was made long after the crimes occurred and under circumstances in which the declarant doubted the potential for the statement to result in additional criminal penalties. Moreover, the totality of the circumstances—including perhaps most notably Jackson's recorded admission that the statement was a

18

lie—strongly undermine any conclusion that the affidavit was reliable. As such, the trial court did not abuse its discretion in excluding Jackson's statement.

### B)      Constitutional Right to Present a Complete Defense

Heightchew next argues that even if Jackson's affidavit does not satisfy the requirements for admissibility under KRE 804(b)(3), his constitutional right to present a complete defense was nevertheless violated by excluding that statement from the jury. We disagree.

The United States and Kentucky Constitutions guarantee criminal defendants the right to a meaningful opportunity to present a complete defense. However, this right does not abrogate the Rules of Evidence. *McPherson v. Commonwealth*, 360 S.W.3d 207, 214 (Ky. 2012). As the U.S. Supreme Court has observed

> [w]hile the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.

*Holmes v. South Carolina*, 547 U.S. 319, 326 (2006); *see also* KRE 403.

We have therefore set forth the following balancing test to determine whether application of a Rule of Evidence violates a defendant's right to present a complete defense: "[T]he defendant's interest in the challenged evidence must be weighed against the interest the evidentiary rule is meant to serve, and only if application of the rule would be arbitrary in the particular case or

19

disproportionate to the state's legitimate interest must the rule bow to the defendant's right." *McPherson*, 360 S.W.3d at 214. Thus, here Heightchew's interest in admitting Jackson's statement must be weighed against the interests KRE 804(b)(3) is intended to serve, and only if application of the Rule would be arbitrary or disproportionate to the state's legitimate interest must the Rule bow to Heightchew's right. *McPherson*, 360 S.W.3d at 214*; Montgomery v. Commonwealth*, 320 S.W.3d 28, 41 (Ky. 2010) (citing *Holmes*, 547 U.S. at 326 and *United States v. Scheffer*, 523 U.S. 303, 308 (1998)).

KRE 804(b)(3) has been a well-established rule in Kentucky courts, and has been effectively used in regulating admission of hearsay evidence to ensure the trustworthiness and reliability of statements against penal interest. Further, rules that, like KRE 804(b)(3), regulate the admission of statements against penal interest are widely accepted for a couple of reasons: (1) they serve a legitimate state interest in ensuring only reliable evidence is presented at trial, and (2) they mitigate the inherent potential for purported confessions of criminal responsibility by another to be unreliable and speculative. *Holmes*, 547 U.S. at 326-27 (citing *Scheffer*, 523 U.S at 309). Moreover, due to the proven legitimacy and rationale behind rules such as KRE 804(b)(3), courts have found the exclusion of hearsay evidence to be unconstitutionally arbitrary or disproportionate only where it places an impossible bar upon the proponent, obstructing his presentation of a defense. *Commonwealth v. Roark*, 641 S.W.3d 94, 100 (Ky. 2021). In *Holmes*, for example, the U.S. Supreme Court found the South Carolina Supreme Court's application of a rule similar to KRE 804(b)(3)

20

arbitrary and unconstitutional. More particularly, the state supreme court's decision was arbitrary because it considered only the prosecution's evidence, but ignored other evidence of record regarding the trustworthiness of the statement. *Holmes*, 547 U.S at 329. Here, unlike *Holmes*, the trial court did not act arbitrarily; rather; it conducted a proper assessment of the affidavit under KRE 804, utilizing the *Crawley* considerations set out by this Court, and viewing in its totality the corroborating evidence in support of the admission of Jackson's statement.

Similarly, unlike *Crane v. Kentucky*, where the U.S. Supreme Court found a violation of a defendant's constitutional right to present a complete defense because the trial court excluded reliable evidence and ignored the circumstances under which the statement was given without any valid state interest, the case before us does no such thing. 476 U.S. 683 (1986). After evaluating the totality of circumstances under which Jackson's statement was given, only then did the trial court decide that the legitimate interest KRE 804 serves in protecting unreliable evidence from being presented to a jury justifiably outweighed Heightchew's interest in admitting untrustworthy evidence from a third party. Further, whereas in *Crane* there was no physical evidence to link the proponent of the statement to the crime, there is a plethora of physical evidence linking Heightchew to the scene of the crime here, including: (1) his cell phone pinging at the location of the crime; (2) a .45-caliber gun and fresh bullet casing matching the original gun and bullets he used in his attempt to shoot Creekmore and Pinion at his house; and (3) texts

and testimony showing that he was picked up by his girlfriend near the scene of the crime. Thus, unlike *Holmes* and *Crane,* we perceive no arbitrariness in the trial court's application of KRE 804(b)(3).

We further note, not only was the exclusion of the evidence not arbitrary, it also was not prejudicial to Heightchew's ability to present his defense. Indeed, the excluded affidavit went to establish the same theory as other evidence presented at trial to suggest that Jackson was the sole perpetrator. We have previously held that a defendant's right to present a defense is not violated by the application of a Rule of Evidence if the excluded evidence was merely cumulative of other evidence presented at trial. *McPherson,* 360 S.W3d at 214. Here, despite the exclusion of Jackson's statement, Heightchew nonetheless was able to present other evidence to the jury in support of his theory that Jackson was the sole perpetrator: (1) Jackson's presence at the scene; (2) Jackson's phone pinging at the site; (3) Jackson's footprints near the vehicle; and (4) the burning of Jackson's clothes. This evidence was all presented by Heightchew at trial, giving the jury a clear opportunity to consider his theory of Jackson being the sole perpetrator in the shooting and burning of Creekmore.

Under such circumstances, we cannot conclude that Heightchew lost the "crux" of his aaltperp theory. KRE 403 conceptualizes that when there is already substantial evidence presented in an attempt to prove a particular theory, any additional evidence introduced to support that conclusion necessarily has lower probative worth, regardless of how much persuasive force

22

it might otherwise have by itself. *Hall v. Commonwealth*, 468 S.W.3d 814, 824 (Ky. 2015). In other words, though Heightchew maintains the affidavit was material to his defense, in actuality it was largely cumulative of other aaltperp evidence presented at trial and could not have substantially "advanced the ball" of his aaltperp defense. *Id.* Thus, because the statement was also highly unreliable as discussed above, its exclusion at trial did not deprive Heightchew of a meaningful and fair opportunity to present his aaltperp defense. Nor was it arbitrary. Accordingly, exclusion of the statement was not error and does not warrant reversal.

## II. The Trial Court Did Not Err in Declining to Provide a Facilitation Instruction.

Heightchew next argues the trial court erred in refusing to instruct the jury on facilitation. During trial and the day before the jury instruction conference, Heightchew submitted new proposed jury instructions for criminal facilitation of murder and arson. At the jury instruction conference, Heightchew requested that the trial court include the facilitation instruction as a lesser-included offense to the already approved principal and accomplice instructions. The trial court rejected Heightchew's request for a criminal facilitation instruction and submitted finalized instructions to the jury. The jury then found Heightchew guilty as principal or accomplice in the crimes pertaining to the death of Creekmore. Heightchew now argues on appeal that the trial court erred by rejecting the proposed facilitation instruction. We disagree.

This issue is preserved. As for the standard of review, this Court reviews a trial court's refusal to give a lesser-included offense instruction under the "reasonable juror" standard. *See Baker v. Commonwealth*, 545 S.W.3d 267, 279-80 (Ky. 2018). Rather than characterizing our review as either *de novo* or for abuse of discretion, we construe the evidence most favorably to the proponent of the instruction, and ask whether the evidence would permit a reasonable juror to make the finding the instruction authorizes. *Id.*

In *Luttrell v. Commonwealth*, we noted that facilitation is a lesser-included offense of complicity. 554 S.W.2d 75, 79 (Ky. 1977); *see also Chumbler v. Commonwealth*, 905 S.W.2d 488, 499 (Ky. 1995). Criminal facilitation shares the same elements as complicity, except that the state of mind required for facilitation is less culpable than that needed for complicity. *Id.* More particularly, this Court has interpreted the culpability of facilitation to reflect the mental state of one who is *wholly indifferent* to the actual completion of the crime, and *without the intention* to promote or contribute to its fruition. *Thompkins v. Commonwealth*, 54 S.W.3d 147, 150 (Ky. 2001). In contrast, complicity requires that the defendant "intend that the crime be committed." *Id.*; *see also* KRS 502.020.

Heightchew cites *Thompkins* in suggesting that because the jury was already allowed to infer the more culpable mental state of complicity, it must be allowed to infer the less culpable mental state for facilitation. 54 S.W.3d at 151. However, this is inaccurate, as this Court has rejected any notion that a facilitation instruction must always accompany a complicity instruction. *Dixon*

24

*v. Commonwealth,* 263 S.W.3d 583, 586 (Ky. 2008). Moreover, a lesser-included instruction, such as facilitation, may be given only if the evidence would allow a reasonable juror to have reasonable doubt about the defendant's guilt of the greater charge of principal or complicity, yet still find the defendant guilty beyond a reasonable doubt of facilitation. *See Skinner v. Commonwealth,* 864 S.W.2d 290, 298 (Ky. 1993); *Baker,* 545 S.W.3d at 279–80. Thus, here, in order for a facilitation instruction to have been warranted, there must have been sufficient evidence as to where a reasonable juror could entertain a reasonable doubt that Heightchew intended to aid in the arson and murder of Creekmore, yet believe beyond a reasonable doubt that Heightchew was wholly indifferent to the completion of those crimes.

Here, there was ample evidence to allow a reasonable juror to conclude Heightchew at least intended for Creekmore to die, with the most obvious being witness testimony and evidence showing that Heightchew, with a premeditated intent, had attempted to shoot Creekmore earlier that day at his house.[4] Moreover, not only was there evidence to support a finding of at least complicity by Heightchew, the evidence, when viewed in its totality, also strongly foreclosed any reasonable finding that Heightchew was wholly indifferent to the crimes. Indeed, it is undisputed that Heightchew: (1) had a motive to aid in the crime due to his suspicions of Creekmore stealing from his home; (2) had told his girlfriend in expectancy of certain events to leave the

---

[4] Prior to Creekmore's arrival, Heightchew or one of his associates had secretly hidden a gun in his mailbox, which Heightchew later obtained to fire at Pinion and Creekmore.

house before Creekmore showed up; (3) had bought a gun prior to the commission of the crime that was confirmed to be the same type of gun that was used and disposed of at the swimming hole; (4) was present at the swimming hole throughout the commission of the crime; (5) had planned a getaway from the crime scene by texting his girlfriend to pick him and Jackson up near the swimming hole; and (6) had told his girlfriend to make up an alibi for him and lie to the police if she was asked any questions about his whereabouts. Quite simply, this evidence strongly weighs against any reasonable finding that Heightchew was indifferent to the killing of Creekmore. We also note that Heightchew points to no separate evidence in the record that could support a finding he was wholly indifferent to Creekmore's death.

Heightchew cites *Manning v. Commonwealth* for the proposition that a facilitation instruction is fair in this case because there is at least some extent of testimony that could support Jackson being the sole perpetrator in the crime. 701 S.W.3d 478 (Ky. 2024). While it is true that the trial court has a duty in criminal cases to instruct on theories that are reasonably deducible from or supported by the testimony, *Taylor v. Commonwealth*, 995 S.W.2d 355, 360 (Ky. 1999), that does not require a trial court to instruct on a theory of a lesser-included offense that lacks an evidentiary foundation. *Houston v. Commonwealth*, 975 S.W.2d 925, 929 (Ky. 1998); *Thompkins*, 54 S.W.3d at 151. Such is the case here.

Admittedly, Heightchew presented evidence at trial that Jackson was present at the scene of the crime and burned his clothing and shoes afterward.

26

However, as discussed above, all of the evidence presented at trial regarding Jackson merely established that he too was present at the scene of the crime, not that he was the sole perpetrator of the crimes. That evidence was in no way relevant to Heightchew's mental state, nor could a reasonable juror conclude from it that Heightchew was indifferent to the crimes.

Further, even if we assume that Jackson was the one who ultimately killed Creekmore at the swimming hole, corroborating circumstances still point toward Heightchew—not Jackson—wanting Creekmore dead. *See R.S. v. Commonwealth,* 423 S.W.3d 178, 186 (Ky. 2014) (explaining that a defendant's state of mind can be inferred from the circumstances surrounding the commission of the crime). Indeed, it is well-supported that Heightchew had more "skin in the game" than Jackson in relation to murdering Creekmore. As noted above, witness testimony and corroborating evidence show that Heightchew had already fired a gun at Creekmore under the belief that Creekmore had stolen items from his home, thus showing a clear motive and incentive to further the commission of the crime.

In contrast, there are no circumstances or evidence corroborating a theory of Jackson independently having a prior motive or incentive to commit the crimes himself. Any interest Jackson had in the commission of the crimes was dependent on or in relation to the interests of Heightchew, whether it be a distaste toward Creekmore for stealing from Heightchew or a sense of loyalty to Heighchew. From this evidence, considered in its totality, it certainly could be inferred that Heightchew had an intent for Creekmore to die, either in

27

vengeance for payback or to cover the tracks of his original attempt to kill Creekmore at his house, and Jackson thus being the friend by Heightchew's side to help carry out the crime. In contrast, the evidence did not support an inference of Jackson being the sole perpetrator and Heightchew being a mere bystander who was wholly indifferent to the crimes.

After assessing the evidence, it becomes clear that Heightchew's reliance on speculative theories and inadmissible hearsay to support a wholly indifferent mental state is greatly outweighed by the sturdy foundation of evidence in support of Heightchew's intent for Creekmore to die. Because the jury was able to come to a reasonable conclusion in light of all admissible evidence that he had the requisite mental state for principal or complicity, and because the evidence did not support a lesser mental state of total indifference, we find that a facilitation instruction was not only unwarranted but would have been an unreasonable misrepresentation of the applicable law. *See Sargent v. Shaffer,* 467 S.W.3d 198, 204 (Ky. 2015) (holding that while the trial court may enjoy some discretionary leeway in deciding what instructions are authorized by the evidence, it has no discretion to give an instruction that misrepresents the applicable law). Given that, even when taken in the light most favorable to Heightchew, there was insufficient evidence to allow a reasonable juror to conclude beyond a reasonable doubt that Heightchew was wholly indifferent to whether the murder of Creekmore was completed, we find a facilitation instruction to be unwarranted and thus properly excluded by the trial court.

### III. The Trial Court's Decision Not To Suppress The Bullet Casing Evidence Was Proper.

Heightchew also argues that the trial court erred by failing to suppress the shell casings found in the front yard of Heightchew's house. Law enforcement officers visited Heightchew's home two times on the night of the incident to attempt to locate Creekmore, given the reports they had received of the shooting incident at Heightchew's house and Creekmore's subsequent disappearance. The first visit is not at issue in this appeal. The second visit occurred in the late-night hours.

During this second visit, officers walked up the driveway of Heightchew's home and knocked on the front door and the "basement door"—each of which was visible on the front of the house.[5] Nobody answered, so the officers proceeded to walk the perimeter of the property, including the back yard, where they used a thermal imaging device on adjacent fields to attempt to locate Creekmore or evidence of a shooting. The officers then returned to the driveway and, in performing one final flashlight sweep of the property, discovered four spent shell casings in the yard near the edge of the driveway. They collected the casings, marked their locations, and left.

Prior to trial, Heightchew moved to suppress the bullet casing evidence and the trial court held a suppression hearing. The trial court ultimately declined to suppress the bullet casing evidence, finding insufficient proof that Heightchew had an interest in the property, and that the location of the casings

---

[5] The "basement door" was located on the front of the home, level with and at the end of the driveway.

was in any event beyond the curtilage of the property. Heightchew now alleges the trial court's ruling was error. Specifically, Heightchew asserts (1) that the trial court erred in finding that Heightchew did not have standing to challenge the constitutionality of the search that discovered the casings; (2) that the search was illegal because the casings were located in the protected curtilage of the property; and (3) that even if the area was not protected by the Fourth Amendment, the discovery of the casings was derivative of illegal police conduct. We find that the trial court properly denied Heightchew's motion to suppress the bullet casing evidence.

In reviewing a trial court's ruling on a motion to suppress, we review factual findings for clear error and legal conclusions *de novo. Williams v. Commonwealth,* 364 S.W.3d 65, 68 (Ky. 2011). The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Warrantless searches are "per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Pace v. Commonwealth,* 529 S.W.3d. 747, 753 (Ky. 2017) (quoting *Katz v. United States,* 389 U.S. 347, 357 (1967)). Fourth Amendment law clearly establishes an exclusionary rule designed to protect that right which states "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *Warick v. Commonwealth,* 592 S.W.3d 276, 280 (Ky. 2019) (quoting *United States v. Calandra,* 414 U.S. 338, 347-48 (1974)). This exclusionary rule

30

excludes both evidence obtained directly during an illegal search and evidence later found derivative of an illegal search, or "fruit of the poisonous tree." *Segura v. United States*, 468 U.S. 796, 804 (1984) (quoting *Nardoni v. U.S.*, 308 U.S. 338, 341 (1939)). However, a defendant can only claim the protection of the exclusionary rule if "[his] own Fourth Amendment rights have in fact been violated," a concept often referred to as having Fourth Amendment standing. *Warick*, 592 S.W.3d at 281 (quoting *United States v. Salvucci*, 448 U.S. 83, 85 (1980)). Therefore, before we evaluate the merits of Heightchew's claim, we must first assess whether he has standing under the Fourth Amendment to challenge the search.

Determining whether a party has Fourth Amendment standing "depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *Id.* at 283 (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)). It is the defendant's burden to establish that he has standing to challenge a Fourth Amendment search. *Ordway v. Commonwealth*, 352 S.W.3d 584, 592 (Ky. 2011) (finding that the defendant had not met his burden of proof of a legitimate expectation of privacy because he presented no actual evidence that he resided in the property at issue). One certainly has a sufficient privacy interest in his residence to give rise to Fourth Amendment standing. *Florida v. Jardines*, 569 U.S. 1, 6 (2013) ("[W]hen it comes to the Fourth Amendment, the home is first among equals."). However, evidence must be presented to prove that the person asserting the privacy interest resides at the

property in question. *Ordway,* 352 S.W.3d at 592. Moreover, the trial court is "required to rule on the suppression motion on the basis of evidence presented at the suppression hearing." *Hayes v. Commonwealth,* 175 S.W.3d 574, 595 (Ky. 2005). Thus, where a defendant fails at a suppression hearing to prove a protectable interest in the property at issue, the trial court must conclude the defendant lacks Fourth Amendment standing.

Here, Heightchew asserted that he had a subjective expectation of privacy by referring to the house as his residence in the motion for the suppression of the evidence. However, in its order denying the motion to suppress, the trial court noted that Heightchew "offered no proof by way of testimony or documentation that he was the owner or even the occupant/tenant of the home." Because Heightchew did not present any evidence at the suppression hearing to establish his relationship to the property, and the trial court was limited to this evidence in making its ruling on the motion to suppress, we cannot say the trial court erred in finding that he lacked Fourth Amendment standing.

However, Heightchew in his briefing before this Court now points to other evidence in the record that, though not presented at the suppression hearing, is sufficient to establish that he resided at the property. This evidence includes subsequent testimony from his grandmother that he lived there, as well as warrants issued in reliance on police affidavits listing the property as his address.

Nonetheless, even if Heightchew had presented this evidence at the suppression hearing and thus properly established Fourth Amendment standing, we conclude the trial court's denial of the motion to suppress would not have been erroneous in any event because the search was not unlawful. "At the [Fourth] Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Florida*, 569 U.S. at 6 (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). Substantive Fourth Amendment law has extended this protection to a home's curtilage, or the area "immediately surrounding the dwelling" which "an individual may reasonably expect to be treated as the home itself." *Quintana v. Commonwealth*, 276 S.W.3d 753, 757 (Ky. 2008). However, the Fourth Amendment "does not . . . prevent all investigations conducted on private property." *Florida*, 569 U.S. at 6. If an area is not deemed curtilage, it is classified as an open field, which "may include any unoccupied or undeveloped area outside of the curtilage."[6] *U.S. v. Dunn*, 480 U.S. 294, 304 (1987) (quoting *U.S. v. Oliver*, 466 U.S. 170, 180 n.11 (1984)). Open fields, even if located on private property, thus are not afforded Fourth Amendment protection. *Dunn v. Commonwealth*, 360 S.W.3d 751, 758 (Ky. 2012).

In *Quintana*, we applied the United States Supreme Court's four-factor balancing test for determining whether an area is curtilage or open field. 276 S.W.3d at 757 (citing *Dunn*, 480 U.S. 294). These factors are "the proximity of

---

[6] "An open field need be neither 'open' nor a 'field' as those terms are used in common speech." *Dunn*, 480 U.S. at 304 (quoting *Oliver*, 466 U.S. at 180 n.11).

the area to the home, whether the area is included in an enclosure with the home, how the area is used, and the steps the resident has taken to prevent observation from the people passing by." *Id.* We will take each of these factors in turn as they apply to Heightchew's case.

First, we consider the proximity factor. Previously, this Court has noted that "[t]he closer one gets to the structure of the house, the more likely one is proceeding into the curtilage." *Commonwealth v. Ousley*, 393 S.W.3d 15, 28 (Ky. 2013). Heightchew argues that the bullet casings were found sufficiently close to the door of the home to weigh in favor of concluding they were within the curtilage. We agree that the casings were found near the home. The trial court found that the bullet casings were "some distance, not a few feet, from the house's entrance and the driveway in the front yard." In reviewing the record, however, we note that while somewhat far from the front door, the bullet casings were closer to the basement door, which also could reasonably be viewed as a front entrance to the home. The casings were also significantly closer to the structure of the house than to the main road. Therefore, we find that this factor weighs in favor of deeming the area to be curtilage.

Turning to the second *Quintana* factor, we next consider whether the area in question was enclosed. The use of a fence or other visible physical boundary plainly "serves to demark a specific area of land immediately adjacent to the house that is readily identifiable as part and parcel of the house" and would weigh in favor of the area being considered curtilage. *Dunn*, 480 U.S. at 302. However, there is no such fence or visible physical boundary

34

in the property at issue in this case, and so this factor does not support the argument that the area in question is curtilage.

The third, and perhaps most important, *Quintana* factor is how the area is used. As noted in *Dunn,* "the central component of [the curtilage inquiry is] whether the area harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." *Id.* at 300 (internal citations omitted). The right to privacy is the backbone of Fourth Amendment protections, and if an area is not used for private matters, it is difficult to see how a party can claim a right to privacy. *Id.* Therefore, to be considered curtilage, an area must be used for "intimate activities of the home." *Id.* at 302.

However, in *Quintana,* this Court found that "the main entrance to a home is so widely perceived by the public as the point of access for the public . . . that it amounts to common knowledge that the public may at least go up to a home's front door, if the way is not barred." 276 S.W.3d at 758. As such, "certain areas such as driveways, walkways, or the front door and windows of a home frequently do not carry a reasonable expectation of privacy because they are open to plain view and are properly approachable by any member of the public." *Id. Quintana* identifies "pollsters, persons seeking assistance, postal carriers, delivery persons, or Girl Scouts selling cookies" as examples of members of the public who may access a home at the main entrance. *Id.*

Here, the area at issue is not associated with intimate activities of the home. The police officers found the bullet casings while standing in the driveway, a public access area under the *Quintana* rule. Moreover, the casings

themselves were located within those public access areas as well, including on the edge of the driveway and less than two feet from the mailbox. The record indicates that this area was accessed by at least postal carriers, as well as guests to the home often, including on the day of the incident. Ostensibly, any member of the public, even the Girl Scouts, could access the property using the driveway and walkways. When an area is used by members of the public to reasonably approach a home, it cannot be said that use of the area is limited to the "privacies of life." Therefore, this factor weighs heavily against the area being categorized as curtilage.

Finally, we turn to the fourth *Quintana* factor, steps taken by the resident to prevent observation of the area. Any obstruction, either through effort made by the property owner to conceal the area or through any physical barricade that blocks view, might weigh in favor of a curtilage finding depending on the specific facts. *Dunn*, 360 S.W.3d at 759. In this case, however, Heightchew concedes that no steps were taken by the residents to obscure the area from view. Thus, this factor weighs in favor of finding that the area is an open field.

Heightchew argues that the weight of the proximity factor alone is enough for us to declare this area curtilage. We disagree. No one factor of the *Quintana* test is dispositive, and any one factor can be unpersuasive when the three other factors weigh heavily against it. With three factors here strongly indicating that the area in question was not within curtilage, particularly the lack of any indication the area was used for private activities, we hold that the

36

area was an open field and officers did not act improperly in entering to collect the bullet casings.

Heightchew further argues that even if discovered outside of protected curtilage, the casings should be excluded as derivative of illegal police conduct. Again, we disagree.

Though we acknowledge the officers proceeded to the back yard, an area frequently within Fourth Amendment protections, we need not decide whether such conduct now requires suppression of the casings subsequently located in the front yard. *See Quintana*, 276 S.W.3d at 760 ("A back yard is not normally an area that the general public would perceive as public access. While the back yard may not always enjoy the protection of the curtilage, it is a rare one that does not."). "[E]vidence will not be excluded as 'fruit' [of the poisonous tree] unless the illegality is at least the 'but for' cause of the discovery of the evidence." *Segura*, 468 U.S. at 815. Here, there is no indication that the officers' time in the back yard in any way contributed to the discovery of the bullet casings. In fact, the search of the back yard did not yield any discoveries, much less any evidence that pointed officers in the direction of the bullet casings. Quite simply, we cannot say under such circumstances that any alleged illegal police conduct was a "but for" cause of the discovery of the shell casings. As such, the bullet casings are not fruit of the poisonous tree and do not need to be suppressed on those grounds. Accordingly, the trial court properly denied the motion to suppress.

37

## IV. The Jury Instructions Regarding Tampering With Physical Evidence Did Not Violate Heightchew's Right to a Unanimous Verdict.

Heightchew next claims that the jury instructions provided by the trial court erroneously permitted a non-unanimous verdict on the tampering-with-evidence charge. Heightchew's tendered instruction on this charge read, pertinently, "he concealed **the firearm** which he believed was about to be produced in the case against him." (Emphasis added). However, the final instruction also included three additional items besides the gun, namely a car, Creekmore's body, and a cell phone. Those final instructions read

> You will find the Defendant Guilty under Count IV of the Indictment of Tampering with Physical Evidence if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:
>
> A. That in this county on or about October 1, 2018, and October 2, 2018, and before the finding of the indictment herein, he destroyed **a car or body or concealed and/or destroyed a cell phone or a 1911 Remington semi-automatic handgun** which he believed was about to be produced or used against him in an official proceeding; AND
> B. That he did so with the intent to impair its availability; AND
> C. That this evidence was physical evidence as defined under Instruction NO. 4; AND
> D. That the trial is an official proceeding as defined under Instruction NO. 4.

(Emphasis added).

In analyzing this claim, the first question is whether the issue was preserved for appellate review. After trial, Heightchew moved for a new trial. In that motion, Heightchew objected to the tampering instruction for the first time, arguing that the instruction violated his right to a unanimous jury by allowing the jurors to conclude Heightchew was guilty of tampering without

38

unanimity as to which item was tampered with. The Commonwealth asserts that this argument was not preserved because before trial, despite Heightchew's tendering of an alternative tampering instruction, Heightchew made no objection on unanimity grounds during the parties' instruction conference to the tampering instruction ultimately given to the jury. We agree that Heightchew's objection is thus unpreserved.

RCr 9.54(2) states:

No party may assign as error the giving or the failure to give an instruction unless the party's position has been *fairly and adequately presented* to the trial judge by an offered instruction or by motion, or unless the party makes objection before the court instructs the jury, stating specifically the matter to which the party objects and the ground or grounds of the objection.

(Emphasis added). The rationale for the preservation rule is that "a court or quasi-judicial body may not be found to be in error where it has not been given an opportunity to (1) rule on the issue or (2) correct any alleged error." *Gasaway v. Commonwealth*, 671 S.W.3d 298, 312 (Ky. 2023) (quoting *Personnel Bd. v. Heck*, 725 S.W.2d 13, 18 (Ky. App. 1986)). "[T]he fact that an issue was made known to the trial court is paramount" to this analysis. *Id.* at 313. Although RCr 9.54 allows a party to preserve its argument regarding a failure to give a certain jury instruction by tendering an instruction, the present circumstances differ because the instruction at issue *was* given, and Heightchew merely disagrees with the formulation of the instruction. Under such circumstances, this Court has held that, where a defendant's tendered alternate instructions "contain[] no qualification" on his position, and the defendant "d[oes] nothing further to clarify" that position, the tendered

39

instructions do not "fairly and adequately" present his position to the trial court, and the argument is not preserved. *Long v. Commonwealth*, 559 S.W.2d 482, 485 (Ky. 1977). In *Owens v. Commonwealth*, we also found an issue regarding instructions unpreserved when the appellant "failed to specifically object to the instruction at trial, and failed to offer an instruction or motion *indicating with particularity his objection to the tampering instruction sufficient to inform the court of his concern.*" 329 S.W.3d 307, 316 (Ky. 2011) (emphasis added). Thus, for a tendered instruction to preserve an allegation of error as to the content of a final instruction on the same charge, the tendered instruction or the party tendering it must sufficiently inform the trial court of the issue such that the trial court has an opportunity to consider and rule upon the defendant's position. When unpreserved, an argument may only be reviewed on appeal, if at all, for palpable error. *See* RCr 10.26; *Gasaway*, 671 S.W.3d at 314.

Here, Heightchew submitted an alternative instruction with wording varying only in the number of identified items from that of the given instructions. He made no further clarification of his position by bringing up the matter of the multiple items during the instruction conference, or by motion or objection. At no point was the trial court given the opportunity to consider whether the given instructions posed a unanimity error. Thus, in the absence of any further clarification of his position, Heightchew's tendered instruction was insufficient to fairly and adequately present his position to the trial court. Therefore, this argument is unpreserved.

40

Next, the Commonwealth maintains that this alleged error was not only unpreserved, but also invited and thus waived. During the instruction conference, when the trial judge asked if there were any further objections, Heightchew's counsel responded, "No, your Honor, I think that accomplishes all of our [issues]," without objecting to the tampering instruction. Later, during a separate bench conference, when the trial judge asked whether there was "any other discussion" that needed to be had in regard to the proposed instructions, Heightchew's counsel responded that they had nothing further. The Commonwealth now argues this waived Heightchew's objection. We disagree.

"Even '[t]he most basic rights of criminal defendants are . . . subject to waiver.'" *Fugate v. Commonwealth*, 62 S.W.3d 15, 19 (Ky. 2001) (quoting *New York v. Hill*, 528 U.S. 110, 114 (2000)). However, the right to challenge an alleged error on appeal is waived only when a party's conduct "reflect[s] the party's knowing relinquishment of [that] right." *Tackett v. Commonwealth*, 445 S.W.3d 20, 28 (Ky. 2014) (quoting *Mullins v. Commonwealth*, 350 S.W.3d 434, 439 (Ky. 2011)); *see also Quisenberry v. Commonwealth*, 336 S.W.3d 19, 38 (Ky. 2011).

For example, where a party affirmatively requests the language of the instruction at issue *or* declines an offered opportunity to cure the error, the right to object has been waived and appellate review is unavailable. *Tackett*, 445 S.W.3d at 28. However, in cases involving a mere failure to object or to appreciate the need to object, *and* where the record indicates that the trial

court did not overtly offer an opportunity to cure the error, the objection is deemed merely forfeited, not invited, and the error may be reviewed on appeal for palpable error. *Id.*[7]

Heightchew's actions at trial did not constitute a waiver of his unanimity argument. The Commonwealth cites *Sanchez v. Commonwealth*, 680 S.W.3d 911 (Ky. 2023), and *Grave v. Commonwealth*, 384 S.W.3d 144 (Ky. 2012), arguing that at trial Heightchew waived his argument to the tampering instructions by making an "express" or "affirmative" agreement to them. However, the facts of this case are distinguishable from *Sanchez* and *Grave.*

In *Sanchez*, the defendant was found to have waived his ability to challenge a unanimity issue on appeal because defense counsel "expressly agree[d] to the jury instructions" *after* discussing unanimity with the trial court. 680 S.W.3d at 930. In *Grave*, appellant's "counsel represented to the trial judge that he accepted the proposed penalty phase instruction despite the judge's willingness to revise the instruction to conform to [appellant's] concern." 384 S.W.3d at 152. Moreover, even "the prosecutor at trial plainly indicated in the presence of defense counsel [that] the proposed instruction was defective." *Id.* Under those circumstances, the appellant waived his ability to challenge the instruction on appeal by declining the opportunity given by the trial court to correct the error. *Id.*

---

[7] "[F]orfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *Gasaway*, 671 S.W.3d at 314 (citing *Kontrick v. Ryan*, 540 U.S. 443, 458 n.13 (2004)). "The valid waiver of a known right precludes appellate review while a forfeited claim of error may be reviewed for palpable error." *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)).

That is not what happened here. Unlike in *Sanchez,* the issue of unanimity was not raised during the discussion of instructions. Heightchew made no representation to the trial judge that he accepted the instructions, nor was he offered any overt opportunity to object to them on unanimity grounds. Rather, he merely failed to object to them on unanimity grounds during the conference. This mere failure was not sufficient to waive his ability to raise this argument on appeal. Therefore, Heightchew did not waive his right to contest the tampering instructions on appeal, but merely forfeited his claim of error. As such, because the issue is unpreserved but forfeited rather than waived, we will review this issue for palpable error.

In determining whether an error is palpable, we consider

> "whether on the whole case there is a substantial possibility that the result would have been any different." To be palpable, an error must be "easily perceptible, plain, obvious and readily noticeable." A palpable error must be so grave that, if uncorrected, it would seriously affect the fairness of the proceedings. "It should be so egregious that it jumps off the page . . . and cries out for relief."

*Williams v. Commonwealth,* 706 S.W.3d 177, 184 (Ky. 2024) (citations omitted).

Heightchew claims that the provided instructions violated his constitutional right to a unanimous verdict by allowing each juror to find enough evidence for a conviction in any of four distinct actions: those related to the car, those related to the body, those related to the cell phone, or those related to the handgun. For example, according to Heightchew, one juror may have convicted him for tampering with the car, while another could have convicted him for tampering with the handgun.

43

Under our state and federal Constitutions, a criminal verdict is not valid unless the jury is unanimous as to each of the elements of the charged offense. Ky. Const. § 7; U.S. Const. amend. VI. "[J]uror unanimity means that jurors must agree upon the specific instance of criminal behavior committed by the defendant but they need not agree upon his means or method of committing the act or causing the prohibited result." *King v. Commonwealth*, 554 S.W.3d 343, 352 (Ky. 2018), *overruled on other grounds by Johnson v. Commonwealth*, 676 S.W.3d 405 (Ky. 2023).

Heightchew's argument is similar to the one made by the defendant in *Brown v. Commonwealth*, 553 S.W.3d 826 (Ky. 2018). In that case, the instructions allowed the jury to find the defendant guilty of complicity to first-degree robbery if they found that he or a codefendant "stole money or jewelry or [a] car." *Id.* at 838. This Court noted that the jurors were not required to be unanimous as to which of the three objects were stolen. *Id.* at 840. We held that a "jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime." *Id.* at 839 (citing *Richardson v. United States*, 526 U.S. 813, 817 (1999)). Rather, the robbery statute simply criminalized the taking of "movable property." *Id.* at 840. As such, the unanimity requirement did not prohibit the listing of multiple stolen items in a single robbery instruction. *Id.* The jury needed only to agree that "*movable property* was taken." *Id.* (emphasis in original).

Similarly, the statute at issue here defining tampering with physical evidence does not require the identification of the exact evidence with which the defendant tampered. It reads:

> A person is guilty of tampering with physical evidence when, believing that an official proceeding is pending or may be instated, he:
>
> > (a) Destroys, mutilates, conceals, removes or alters *physical evidence* which he believes is about to be produced or used in the official proceeding with intent to impair its verity or availability in the official proceeding[.]

KRS 524.100(1)(a) (emphasis added). Thus, as the instructions in *Brown* permissibly allowed the jury to agree, based upon several included items, that "movable property" was stolen, the instructions here permissibly allowed the jury to agree, based upon several included items, that "physical evidence" was tampered with. Therefore, the tampering instructions posed no unanimity error, palpable or otherwise, and do not warrant reversal.

**V.    There Is No Cumulative Error Warranting Reversal.**

Finally, Heightchew argues that even if no one error is reversible, he is entitled to reversal due to cumulative error. Under this doctrine, "multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair." *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010). However, this Court has also noted that where there are no errors, there cannot be cumulative error. *Leavell v. Commonwealth*, 671 S.W.3d 171, 184 (Ky. 2023). We have found no errors in this case, and so clearly there is no cumulative error.

**CONCLUSION**

For the foregoing reasons, we affirm the judgment and sentence of the Henry Circuit Court.

All sitting. Lambert, C.J.; Bisig, Goodwine, Keller, and Thompson, JJ., concur. Conley, J., concurs by separate opinion in which Nickell, J., joins.

CONLEY, J., CONCURRING: This case presents another instance of the question of preservation when it comes to jury instructions, which this Court has recently addressed in *Boggs v. Commonwealth*, 718 S.W.3d 651, 658-59 (Ky. 2025) and *Sweet v. Commonwealth*, ___ S.W.3d ___ (Ky. 2025), 2024-SC-0002-MR, 2025 WL 2998577, at *14-*15 (Ky. Oct. 23, 2025). I agree the error is preserved because this case presents an instance in which Heightchew tendered a jury instruction on the tampering with evidence charge that listed only the Remington handgun, whilst the trial court gave a jury instruction that listed the Remington handgun, as well as three additional items, to wit: a car, a body, or a cell phone.

Our jurisprudence holds that

> a party can preserve his objection to jury instructions in one of three alternative ways: (1) by offering an instruction; (2) by motion; or (3) by making a specific objection before the court instructs the jury. The rule does not require any additional objection or filing so long as one of these three is satisfied.

*Jerome v. Commonwealth*, 653 S.W.3d 81, 85 (Ky. 2022) (internal citation omitted).

*After tendering his proposed instruction*, the trial court asked both Heightchew and the Commonwealth, twice, if there were any objections or

46

issues needing to be addressed regarding jury instructions. Both times, Heightchew failed to raise the difference between his and the trial court's tampering with evidence instruction. The Commonwealth argues this constitutes invited error even though a different instruction was tendered.

I disagree as that position is not consistent with *Jerome*. We do not require a party to pugnaciously note an objection for preservation. We must be cognizant of the realities of trial practice. A trial judge does not like to be second-guessed any more than anyone else. To require lawyers to continually, at every opportunity presented, note an objection is likely to irk a trial judge and potentially disturb his equanimity on the bench. It is unfortunate but true that no one wants to be on the bad side of a trial judge. Our law recognizes this reality which is why preservation of an objection on jury instructions need only take one of three forms and there is no additional requirement. *Id.* Accordingly, because Heightchew tendered a jury instruction which was rejected and the trial court's instruction contained material differences, I agree this issue is preserved.

Finally, this issue is coming before this Court all-too-often. It appears that trial lawyers, particularly criminal defense attorneys, are struggling to preserve objections to jury instructions. Some on this Court take a more lenient approach, but the Court has held steady to its rules regarding lack of preservation and invited error. *Sanchez v. Commonwealth*, 680 S.W.3d 911, 930 (Ky. 2023); *Sweet*, 2025 WL 2998577, at *14-*15 (Ky. Oct. 23, 2025). It is not our rules that are causing these alleged errors to be unpreserved or invited.

47

It is the failure of trial lawyers to take the time to prepare their own jury instructions for the trial court to consider or of making an objection on the record. If a criminal defense attorney has not adequately prepared for trial on the specific issue of jury instructions then the remedy is an RCr 11.42 action, rather than watering down our standards of preservation, invited error, or of grasping at straws to find distinctions between cases. *Sweet*, 2025 WL 2998577, at \*15-\*16 (Ky. Oct. 23, 2025).

Nickell, J., joins.

COUNSEL FOR APPELLANT:

Travis Bewley
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Joseph Crawford White
Assistant Attorney General